Case No. 18-1201 at Al, Circus Circus Casinos, Inc. Doing business as Circus Circus Las Vegas Petitioner v. National Labor Relations Board Mr. Tremor for the petitioner, Ms. Eastveld for the respondent Good morning, and may it please the Court. I'm Paul Tremor. I represent the petitioner, Circus Circus Casino, and I've asked to reserve four minutes for rebuttal. A petition to vacate an NLRB's administrative decision on the grounds that the evidence is insufficient is not ideal. We know that. But the Board's rubber-stamp approval of the ALJ in this case, like the Court's decision in Jackson Hospital 647 F3D 1137, requires review. The ALJ's decision is not supported by the weight of the evidence, and it makes sense only if fabricated testimony is credited and all inferences are drawn in the NLRB's favor. The Court should not have confidence in, nor should it show deference to, an administrative process that relies on evidence from someone who fabricated evidence. And that's the first issue before the Court. The case starts with a supposed threat made on November 21, 2013. The employee, Michael Tram, was a temporary carpenter. He was hired from the hall for a short-term project, installing steel plate guards over the lock and latch of guest room doors. The employees were in a safety meeting. Fifteen to twenty others were present, according to him and one other witness, an operating engineer named Fred Tenney. Tenney opened the meeting by complaining about the possibility that he could be exposed to second-hand marijuana smoke while working in guest rooms. They asked the department director, Ray Cordell, to give a procedure. Cordell told them to call their, quote, senior watch, which is the name of the line-level supervisor in the facilities department. According to Tram and Tenney's testimony, they asked for clarification, and it is at this point that, according to them, Cordell got mad. His face supposedly turned red. He supposedly threatened Tram by saying, quote, maybe we just don't need you anymore. And then, almost like a movie, Tenney supposedly said, that sounded like a threat, to which Tram replied, that didn't sound like a threat, that was a threat. And that was the testimony at the trial. During the hearing, Tenney testified that he walked out of this meeting, logged into the facility department's work order database called Hot Sauce, and immediately made an entry, quote, Rafe threatened Carpenter. Tram claimed that he and Tenney discussed this entry, and that Tenney even gave him the work order number so that it could be accessed later on, when they also discussed filing claims with OSHA and other administrative agencies over the same threat. And here's the thing, anyone who's done trial work knows that the evidence I just described, a contemporaneous written note, transcribed into the company's work order system, is pure gold. It is the best kind of corroborative evidence that could be produced during a hearing. It was perfect. And it was presented strategically by the NLRB during the hearing. It wasn't disclosed before the hearing began. The NLRB... It's my understanding, correct, you don't have a right to engage in any discovery before the hearing? That's absolutely right. But what I would suggest... Before the hearing, that Tenney was going to testify that he made an entry. That's right. On page 24 of our brief, we cite the complaint allegation. The NLRB is not even required to disclose the date the alleged threat was made. The complaint just said it happened in late November. My point is that in normal practice, if such a record existed, the NLRB would have subpoenaed that record. It didn't do that. And it didn't disclose the existence of this supposed record. After he testified, how many days was this hearing? I forgot. Three. You didn't ask for a postponement or an adjournment so that you could compile all the records for November. You said there were 12,000 or something. That's right. No, I didn't. I went straight to the Circus Circus Hotel and pulled the records from November 21st, because when Mr. Tenney testified to that effect, I set the hook to see if he really believed it was November 21st. He was certain. He confirmed that certainty to the ALJ when she questioned him. So I went and got the record, and the record wasn't what he said it said. It didn't say rape-threatened carpenter. It actually, being the only conductor of any conversation that took place that day, corroborated all of the company's witnesses. The ALJ disregarded that contemporaneous note on the grounds that he may have thought it was a different day. But that wasn't justified, given the questioning. And I think it's also important. When did the ALJ come up with that rationale that it might have been a different day? When she issued her decision. So that's the first time. That's exactly right. And I'll note that the General Counsel did not recall Mr. Tenney to claim that he may have made a mistake. And it was after the ALJ opinion that you asked for the record to be reopened so you could introduce all of the documents for November. That's exactly right. And those records were voluminous, but they demonstrate that what Mr. Tenney said wasn't true. And what I'll note is that he prepared with the General Counsel's lawyer at his house before the hearing began. I'm not suggesting anything improper took place. But what I am suggesting is that, and this testimony was elicited on direct, he didn't make a mistake. This was a calculated intent to deceive the ALJ. And it was calculated, it was even more, it was weightier because by alleging that a record existed within the company's record-keeping system, had we not been able to obtain that record before the close of the trial, there would have been an adverse inference entered against the company. There was no reason for us to get 12,000 records when he stated with certainty that the threat was supposedly made on November 21st. We found a record from that date that said not only did what he said was false, that he had made a calculated effort to lie to the ALJ, but also that it corroborated what all of our witnesses testified to during the hearing. So what exactly would have happened then if the record was reopened? Because you knew that the hot sauce records were an issue, right? Pardon me? You knew that the hot sauce records were an issue? We knew that the hot sauce record for that date, November 21st, was an issue. And what I would suggest is that this is the only case I've ever been involved in where a witness under oath purposely misstated what he put into a record. The ALJ excused him from that misstatement on the grounds that he may have made a mistake and it may have been a different date. Adding in the additional documents would show that he didn't make any mistake at all. It's possible, I suppose, well, the ALJ said in her decision she would have credited him anyway. I've never seen a situation where an ALJ or any other finder, in fact, has credited the testimony of a witness who lied under oath. Whether there's reasons that the ALJ supplied in her decision for doing so, that's not a preponderance of the evidence. That's not sufficient evidence, particularly when this individual, Mr. Tenney, was the only witness who corroborated the charging party, and the ALJ credited the charging party, Mr. Schramm and Mr. Tenney, because their testimony was internally consistent. That was the primary basis for crediting and giving weight to both of those individuals' testimony. I don't understand what you mean when you say that you don't know of a case where somebody has credited the testimony of somebody who lied under oath, because isn't the question whether there was a lie under oath? Well, I don't think that's in question. What exactly is unquestionably the lie? Oh, the particular date, is that what you're talking about? That is the particular date. That's what it's about. Yeah, but when that allegation was made during the hearing, there wasn't any question about what date it took place, nor did, as I said, nor did General Counsel recall Mr. Tenney to say that maybe it happened on a different date. The complaint alleges the threat happened at the end of November 2013. Mr. Schramm and Mr. Tenney both claimed that it happened in the safety meeting that was the last safety meeting on the Thursday before Thanksgiving. That leads to November 21, 2013. The ALJ asked Mr. Tenney, are you sure it's that date? And he said, yes, I know because I was there. I don't think that the date was in dispute. So when the ALJ suggested that, well, maybe he made a mistake, that wasn't justified by the record. It wasn't permitted by any reasonable inference. It was an ALJ backing into a credibility determination because she apparently found the person personally persuasive. I'm almost out of time. I do want to skip ahead to one other issue, the Weingarten allegation. And I would add that the discharge allegation made the company's termination of Mr. Schramm, it relies completely on the threat allegation. And absent that threat, there's no evidence of animus in the record. With respect to the Weingarten allegation, I'll note that one of the members of the board dissented from the board's decision. And he explained that that was because Mr. Schramm never actually requested a representative. And I'll note that Weingarten is not Miranda. Mr. Schramm showed up to the interview knowing that he had called the union. The union representative wasn't there. He chose to go forward anyway. There's nothing wrong with what the employer did. Weingarten didn't require the employer to stop the interview and help him find a representative when he knew that his representative wasn't available and he didn't request alternative representation. Weingarten, like I said, is not Miranda. It's subject to the practicalities of the question. I don't understand that argument. What he said was, I called the union three times and nobody showed up. I'm here without representation. Suppose he then went on and said, I wish I had representation. Would you still be making the same argument? No. I would say, if he said, I wish that I had representation, then we would have said, do you want representation? If so, you have three options. We can stop the interview. And so then everything just turns on whether it was arbitrary for the board to conclude, the majority of the board to conclude, that when he said, nobody showed up, I'm here without representation, he signaled that he would like representation. Right? Because you agree that if he had signaled, if you conclude that that's a signal that he would like representation, then the way things proceeded from there were out of step with Weingarten. Well, I don't agree with the factual conclusions that were reached. All of our witnesses said that he didn't make such a request. But when you say signal, if he had actually said, I'm requesting a representative, or I wish that I had a representative, then, yes, I agree that Weingarten would have been violated. So the way you view it, then, is that you have to actually ask for a representative. It's not enough to indicate that you would like a representative. It depends on what the indication is, I suppose. But, yes, I think some sort of clear statement is necessary. You think there needs to be a clear statement, I see. Otherwise, the rule's not, it's incapable of application in a workplace setting. Again, we're not dealing with police or anything like Miranda. This is just a workplace where, and the right to count representation under Weingarten flows from the duty to bargain. It doesn't flow from the Constitution or any other statute. But that's the whole point. The Board's case is they just, they don't accept that there needs to be a clear statement. They say no magic or special words are required to satisfy this element of the Weingarten rationale. I don't disagree that no magic words are required. But there needs to be some manifestation of a request. He didn't make a request. He said, I called the union. The union's not here. If he didn't want to go forward, he could have requested time to find an alternative representative. As the Montgomery Ward case cited in our brief, as well as Coca-Cola say, if the chosen representative is unavailable, the Board law imposes the burden on the employee to request alternative representation. When he's looking for a particular representative as opposed to representation generally? Well, the evidence is that he contacted Richard Williams, the Secretary-Treasurer of the Carpenters Union, and that was the representative that he requested attend the meeting. So it doesn't say. He never claimed one way or the other who he was attempting to have represent him at this hearing. But he called one person. That one person didn't come. As Chairman Ring set forth in his dissent, the shop steward, Jerry Mung, who would have been available to him, was in the carpenter shop at that time. It would have been very easy for Mr. Schramm to request an alternative representative if he wished to do so. It shouldn't be – Weingarten can't place a burden on the employer to guess what an employee wishes to have. The way the Supreme Court defined the right is it's the right of the employee to refuse to submit to an interview without representation. So the question is, did he refuse to submit to an interview without representation? He did not. He did not refuse to submit to an interview without representation. He showed up. There was no representation available. He didn't request representation. He proceeded with the interview. But that would have been the case even if he'd asked. If he'd said, I wish there were a representative here, do you think that at that point the company could have continued questioning him and then the response could have been, well, he didn't refuse to participate without a representative because he answered the questions? Well, no. Once he actually requests – That can't be right, right? No, I don't agree with that. Once he requests a representative, the employer has a couple of options. You know what those options are. And had he done that, that's exactly what would have happened. Right. So everything turns on whether the words that both the majority and the dissent agree were stated were enough to signal an interest in a representative. And your view, and I understand your view, is that they weren't. But what I would argue is that the board – the issue is not whether or not the board's application of Weingarten was arbitrary. The board is applying Supreme Court precedent, and the board's application of Supreme Court precedent under Weingarten isn't entitled to deference. Well, I'm sorry. What was the last point? The board's application of Weingarten, which is a Supreme Court decision, is not entitled to deference. It's interpretation of Weingarten. That's right. That's right. But doesn't, in part, the interpretation turn on the credibility determination made by the ALJ about – It does. From our perspective, Mr. Schramm's testimony shouldn't be credited at all. But even if it were credited, the best version of events is that he showed up and said, I called the union three times, even though he only called it twice. I called the union three times and no one's here. Right. And your view is that just – that can't be seen reasonably by the board as an indication of an interest in representation. That's right. Thank you. May it please the court. Kelly Isbell here on behalf of the National Labor Relations Board. This case is primarily a case where circus is challenging the board's credibility determinations, and the court does not overturn those determinations unless they're found to be hopelessly incredible. And on this record, they just are not. If we start with the threat, not only did Tenney and Schramm mutually corroborate each other's testimony, but the ALJ explained her findings. She said they both answered in a forthright and honest manner, they were non-argumentative, and they answered the questioning honestly. She also said that only Cordell, of all the witnesses put on by the company, only Cordell said he did not make the threat. The other company witnesses either were not asked or couldn't remember whether the threat was made. So there is no rebuttal testimony saying that the threat didn't happen on the company's side. What we have are two witnesses who say it did. And that's enough for the judge to find that the threat occurred. But there's pretty powerful evidence on the other side that you're not mentioning, namely that there was no report of the sort that Tenney described, and that's pretty powerful evidence that he was not either recalling correctly or telling the truth. And the ALJ refused to consider that. It refused to reopen. The ALJ was not asked to reopen, Your Honor. The board was asked to reopen. And the board does not reopen when the evidence is not newly discovered or for merely impeaching a witness. Those are standard board rules. But in this case, the ALJ explained why there were a couple of dates of hot sauce records entered. The issue of which date the threat occurred was in question during the hearing because Tenney might have said it was the 21st, but Schramm said it could have been the week before Thanksgiving or maybe the week of Thanksgiving. I think we had our Thursday safety meetings on Wednesday. Cordell, the chief engineer himself, insisted that it was December 6th. So there was a question about which time this whole discussion about marijuana smoke occurred. But the ALJ explained that even if Tenney had never made that entry, that he misremembered what happened, she believed that the testimony he and Schramm gave was so compelling that she believed them. She didn't think Tenney was somehow creating, I don't even know that they put this below, that Tenney was trying to put something over on the judge or that he was. I should have asked this of the counsel for the employer. But what exactly is the function that this whatever hot something serves? What is it? It's probably a better question for Mr. Trimmer. But as I flip through the records and there are things like Tenney would record every time he went to a hotel room to fix the air conditioning. I mean, anything he did. It's just the employees that make entries. I'm not even I think probably anyone who has a BlackBerry. Mr. Schramm didn't have a company issued BlackBerry, so he couldn't. And housekeeping would put in a request for the curtains are down in room 301 and somebody would see it and go do it and make a note. Those kinds of things are what I read in the record. It's sort of a diary. I guess or maybe a record of who's doing what at what time. I'm just wondering why anybody would even record the incident. For some reason, Mr. Tenney recorded when he went to safety meetings or they also have pre-shift meetings. I think probably his day is productivity. I'm not entirely sure. And I don't know if other people made the same notations. But I do know the ALJ was very careful to explain why she did not consider Mr. Tenney to have committed perjury by misremembering the substance of his hot sauce memorandums. So that's one issue of credibility. We also have the Weingarten issue. And the ALJ found there was no dispute that Schramm made the statements he made about requesting a union representative. Aside from the fact of whether or not we decide that's a request under Weingarten. But there was no dispute he made those statements. Maurer was one of the HR associates who was in the meeting. She said he made the statements, put it at the end. Mr. Cordell, the chief engineer, said he didn't request a union steward, which was undisputed. Nobody said he requested a union steward. I don't think there is a dispute about what was said. I mean, I know there's an argument that's been made that you shouldn't credit a testimony. But the principal argument is even if you do credit the testimony, that's not enough. Right. Right. And we, of course, think it is. As you only have to, the employee has to use language reasonably calculated to apprise the employer that he wants assistance. And I don't know how you could listen to those words and not know that Schramm wanted assistance. I called the union three times. Nobody showed up. I'm here without representation. There's nothing else those words mean. And once that request is made, the employer has to stop and give the three options. So it just seems to me that when you read those words, both sides in some sense seem to be overstating their case. Because when you read those words, it sort of depends on the impression you're left with after those words have been said. Because he could have followed that up by saying, and obviously what I'm saying by that is it would be great in my mind if there were a representative here. If that's what that communicates, then you're, it seems to me, you're in a very good stead. If what he followed up with is, and what I'm communicating by that is, even though I don't have a representative, let's go. Well, then you wouldn't be in such good stead. And so it seems like he said some words that we, for our purposes, assume is the state of the record. And then the question is, what's the impression that's left by that? Well, before I, let me just say, first of all, that this is exactly the kind of question that the court leaves to the board's deference, determining whether or not those kinds of statements meet the one-garden standard. And employees, I tried to find a case that said exactly the same thing, but of course nobody does. Employees say wildly different things. I need a witness. Well, what does that mean? You've got witnesses. There are five people in this room. Or I need someone who can explain this to me. Well, the HR people are here. They can explain it to you. Right. And those are, those statements are actual cases where the board has found that that was sufficient to trigger one-garden. Yes, Your Honor. So here, even in cases where employees don't mention the union or representation, the board has found a one-garden violation. Here, SRAM has made it clear that he is looking for union assistance. And I think that's enough under the board's rule. But whether you think it's enough or not. The board thinks it's enough. I'm sorry, Your Honor. Right. The board must have thought it was enough because the board said it was. And then the question for us is, in reviewing that, whether it was arbitrary for the board to reach that conclusion? Is that what we're looking at? Or what's the question before us? Yes, because you're looking at the board's sort of factual inferences under one-garden. The board isn't really interpreting one-garden as such. It's applying one-garden to the facts of this case as it does in every one-garden case. And when we do that, what are we asking? I think you're asking whether or not the board—we always say reasonably—whether or not the board reasonably applied the facts of this case to the one-garden standard. Was it reasonable? This particular question is not substantial evidence. So it's whether the board properly determined that that was a request under one-garden. So if it's not substantial evidence in your view, then it's an arbitrary, capricious question. I think so, Your Honor. So under one-garden, an employee can choose to go forward without a union representative. Can choose. With a meeting. Yes, Your Honor. Right? And so, I mean, does your position, though, sort of—does it require, essentially, an employer to make some kind of prophylactic statement? Yes. Yes. Let's assume that the request was made. Everybody agrees. No, just in this case. So he said what he said. I mean, is the employer then required to clarify what was meant by that? To clarify. Hmm. I mean, if the employee has given sufficient notice, then yes. So I understand your view, the board's view, is that they've given sufficient notice, but then they also choose to go ahead with the meeting, which is permissible under one-garden. So— It's permissible if they give the employee the options. And remember, the options are not onerous. One is you can grant the request. SRAM didn't know that Jerry Mong, the union steward, was in his office. SRAM no longer had a key or a badge and could not go to the carpenter shop where, evidently, Mr. Mong was. I learned that reading the transcript. So one is you can grant the request and somebody calls the union steward and he comes forward. Two, you can deny the request, end of interview, and you get to make your decision on discipline based on what you already know. Or three, you have the middle option, which is giving the employee the request to go forward without representation or to stop. It doesn't have implicitly what happened, the third option. Because one-garden is set up to sort of balance the inequities of power in these kind of situations, the employer needs to give the employee the choice. He doesn't know. Are there any board cases or cases from the circuit suggesting that the employer has an affirmative duty to spell out those options? All of the one-garden cases say that. I didn't think there was any. I didn't even think the employer disputed that if there was, in fact, a request here, if he had said exactly what he said and he followed up by saying, and therefore I wish there were a representative present. Right. I don't think anybody disputes, as far as I know, but correct me if you're wrong. Where there's an uncertainty is the employer. The problem is the cases don't come to the board unless there is an uncertainty, right? So once the board decides, the employer is acting at its peril, as it does in a lot of cases. But if it doesn't, there are very few one-garden cases where the employee is explicitly clear and says, I want a unit representative. They usually say something more ambiguous. And then the employer's ‑‑ I thought the way the decision tree works, and correct us if I'm wrong about this, I thought the way the decision tree works is the first question is whether the request has been made. That's just, and there may be cases of uncertainty, like this one, where it's not an affirmative request. I mean, the request could have, I think you would have to agree, a request could have been made more clearly than this was. Yes, Your Honor. Right. So it is uncertain in some sense. And then the way the decision tree works is the first question is, was what was said sufficient to apprise the employer of an interest in representation? Yes, Your Honor. And if that's true, then the prophylaxis does kick in. That's just the way one-garden works, is at that point it's incumbent upon the employer to issue the choices. So everything turns on whether, at the first step, what everybody agrees was the statement that was made was enough to signal the interest in a representative. Absolutely. Is that the way you look at it? Yes. That is the way you see it? Absolutely. I have gone way over my time. Are there further questions? Okay. Thank you. Thank you, counsel. Two minutes for a vote. Thank you, Your Honor. Do you disagree with that, the way that was laid out, in response to Judge Rouse and my questions? Only slightly. I don't think that one-garden requires a prophylactic statement. Once the request is made, one of three options or one of three things have to occur. If the request is made, the employer could just grant it. Or the employer could say this and nothing else. If you want a representative, we're not going to interview you and say nothing else. Or the employer could say, we're not going to interview you, period, and discontinue the interview. All of those things would be permissible. This sort of three multiple-choice options don't need to be presented to the employer. But in terms of continuing the interview, I think everybody agrees the employer can't continue the interview without saying anything. Yes, I agree with that. And what I'll say is, you know, typically whether a right has been waived is whether it's knowing and voluntary. There's no dispute in the record that Eric Collin, the HR representative, informed Mr. Schramm of his right to obtain a union representative, which is what triggered Mr. Schramm's calls to the Secretary-Treasurer of the Carpenters Union. He showed up at the hearing ready to proceed with the interview, knowing that no representative was there, and he didn't request an alternative. The other thing I'll note is Weingarten doesn't have anything to do with the balance of power. Under the Weingarten decision issued by the Supreme Court, it flows from the duty to bargain. The Weingarten representation is necessary to assist the union in prosecuting rights under the collective bargaining agreement. It doesn't have anything to do with some sort of substantive right that employees have to have assistance during questioning. The last thing I do want to address is the hot sauce thing. Hot sauce is a maintenance database that's used to log every work order in the entire hotel casino. So if there's a problem with a faucet in the guest room, if a piece of tile is loose down somewhere in the back of the house, all of those things are logged into hot sauce and then assigned to the appropriate division within the facilities department. It's not used to record workplace concerns, workplace complaints, or anything like that. There would be no reason to ever do any of those things. Its purpose is if Mr. Does it go to a central clearinghouse for somebody who says their faucet's leaking in room 101? Yeah. The way it works is if the faucet's leaking in room 101 and that person calls the front desk, the front desk then makes an entry into hot sauce, and it's automatically routed to a member of the plumbing department. If no one in the plumbing department sees it on their list of work orders and takes it, a manager in the plumbing department would then assign that task order to someone. But in terms of what happens with the work order after that, it's not reviewed in any substantive way by management. It's that someone except the work order hasn't been fixed. But any substantive entries related to what happened during the fixing of that plumbing problem aren't reviewed. Thank you for your time. Thank you, counsel. Thank you, counsel. The case is submitted.
judges: Srinivasan, Rao, Randolph